**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**SECURITIES AND EXCHANGE COMMISSION** Case No.: 1:23-cv-23749-RAR

v.

*Plaintiff*

**SHANNON WESTHEAD, ALEC VAGNOZZI, PISCES INCOME FUND, LLC, PISCES INCOME FUND PARALLEL, LLC, ALBERT VAGNOZZI, CAPRICORN INCOME FUND I, LLC, CAPRICORN INCOME FUND PARALLEL, LLC, MICHAEL TIERNEY, MERCHANT SERVICES INCOME FUND, LLC and MERCHANT SERVICES INCOME FUND PARALLEL, LLC**

*Defendants*

**DEFENDANTS ALBERT AND ALEC VAGNOZZI'S**
**OPPOSITION TO THE SEC'S MOTION FOR FINAL JUDGMENTS**

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1
II. RELEVANT PROCEDURAL HISTORY ..... 3
III. FACTUAL BACKGROUND ..... 5
A. Pertinent Facts Pertaining to Alec Vagnozzi ..... 6
B. Pertinent Facts Pertaining to Albert Vagnozzi ..... 8
IV. LEGAL ARGUMENT ..... 12
A. THE COURT HAS DISCRETION TO AWARD DISGORGEMENT, WHICH IS AN EQUITABLE REMEDY AND NOT A PENALTY ..... 12
1. Disgorgement Against Alec Vagnozzi is Inequitable ..... 13
2. Disgorgement Against Albert Vagnozzi is Partially Barred by the Applicable 5 Year Statute of Limitations and Must Further Be Reduced by Continued Legitimate Business Accounting Expenses Incurred That Were Personally Paid by Albert after Capricorn and Capricorn Parallel Ceased Operating ..... 13
B. THIS COURT HAS DISCRETION TO AWARD AND REDUCE PRE-JUDGMENT INTEREST UNDER CIRCUMSTANCES WHERE THEY ARE PUNITIVE AND INEQUITABLE ..... 14
1. It Is Inequitable to Have Alec Vagnozzi Pay Pre-Judgment Interest ..... 15
2. Albert Vagnozzi Pre-Judgment Interest Should be Re-Calculated based on The Reduced Disgorgement Amount ..... 16
C. THIS COURT SHOULD NOT AWARD OR REDUCE THE CIVIL PENALTIES AGAINST DEFENDANTS ..... 16
1. The SEC's Civil Penalty Should be Reduced Because Albert Vagnozzi's Efforts to Protect Investors, His Reliance on Counsel, and PAR's Concealment Weigh Against Severe Penalties and Do Not Serve As a Deterrent ..... 18
2. Civil Penalty Should Not Be Awarded Against Alec Vagnozzi Because of His Reliance on Counsel, His Reliance on Par Funding, His Minimal Involvement and Because Of His Financial Situation ..... 21
D. THIS COURT HAS THE DISCRETION TO MODIFY OR REVOKE THE CONSENT JUDGMENTS REGARDING PERMANENT INJUNCTIVE RELIEF WHERE THERE IS NO IRREPARABLE HARM OR RECURRENT VIOLATIONS ..... 22
V. CONCLUSION ..... 24
CERTIFICATE OF SERVICE ..... 25

## TABLE OF AUTHORITIES

**Cases**

*Blau v. Lehman*, 368 U.S. 403 (1962)........ 15
*Burton v. City of Belle Glade*, 178 F.3d 1175 (11th Cir. 1999)........ 23
*Indus. Risk Insurers v. M.A.N. Gutehoffnungshtte GmbH*, 141 F.3d 1434 (11th Cir. 1998)....... 14
*Kokesh v. SEC*, 581 U.S. 455 (2017)........ 13 n.7
*Liu v. SEC*, 591 U.S. 71 (2020)........ 13 n.7
*Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521 (11th Cir. 1987)........ 15
*Rolf v. Blyth*, 637 F.2d 77 (2d Cir. 1980)........ 15
*Romero–Barcelo*, 456 U.S. 305 (1982)........ 22
*SEC v. Calmes*, 2011 WL 13174658 (S.D. Fla. 2011)........ 1 n.1, 18
*SEC v. Calvo*, 378 F.3d 1211 (11th Cir. 2004)........ 12, 23
*SEC v. Carrillo*, 325 F.3d 1268 (11th Cir. 2003)........ 14
*SEC v. CBSG*, 2024 WL 4826059 (S.D. Fla. 2024)........ 1 n.2, 19 n.13
*SEC v. ETS Payphones, Inc.*, 408 F.3d 727 (11th Cir. 2005)........ 12
*SEC v. First Jersey Securities*, 101 F.3d 1450 (2d Cir. 1996)........ 15
*SEC v. GMC Holding Corp.*, 2009 WL 506872 (M.D. Fla. Feb. 27, 2009)........ 15
*SEC v. Huff*, 758 F. Supp. 2d 1288 (S.D. Fla. 2010)........ 17
*SEC v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275 (S.D. Fla. 2007)........ 15
*SEC v. Monterosso*, 756 F.3d 1326 (11th Cir. 2014)........ 12, 17
*SEC v. Smyth*, 420 F.3d 1225 (11th Cir. 2005)........ 23
*SEC v. Snyder*, 2006 WL 6508273........ 18
*SEC v. Warde*, 151 F.3d 42 (2d Cir. 1998)........ 15
*SEC v. Yun*, 327 F.3d 1263 (11th Cir. 2003)........ 12
*SEC v. Yun*, 148 F. Supp. 2d 1287 (M.D. Fla. 2001)........ 15
*Sripetch v. SEC*, 608 U.S. – (2026)........ 13 n.7

**Statutes, Regulations, and Rules**

15 U.S.C. § 77e(a) (Securities Act § 5(a))........ 4
15 U.S.C. § 77e(c) (Securities Act § 5(c))........ 4
15 U.S.C. § 77q(a) (Securities Act § 17(a))........ 4–5
15 U.S.C. § 77t(d)(1) (Securities Act § 20(d))........ 16
15 U.S.C. § 77t(d)(2)(A)........ 17
15 U.S.C. § 78j(b) (Exchange Act § 10(b))........ 4–5
15 U.S.C. § 78q(a) (Exchange Act § 15(a))........ 4
15 U.S.C. § 78u(d)(3)(A) (Exchange Act § 21(d)(3))........ 16
15 U.S.C. § 78u(d)(3)(B)........ 16–17
15 U.S.C. § 78u(d)(8)(A)........ 12–13
28 U.S.C. § 2462........ 13 n.7
17 C.F.R. § 240.10b-5........ 4–5

Defendant Albert Vagnozzi ("Albert" and/or "Defendant") and Alec Vagnozzi ("Alec" and/or "Defendant"), by and through undersigned counsel, Bochetto & Lentz, P.C. ("B&L"), hereby file their Response in Opposition[1] to the Securities and Exchange Commission ("SEC")'s Motion for Final Judgment ("the Motion") and in support thereof state as follows:

## I. INTRODUCTION

The SEC seeks a permanent injunction as well as severe monetary civil penalties, disgorgement and prejudgment interest payments against Albert Vagnozzi and Alec Vagnozzi, who, like the investors the SEC protects, have also been victimized by the conduct of Par Funding.[2] Albert and Alec Vagnozzi have previously consented to injunctive relief and the strict liability non-registration violations, and do not dispute that the promissory notes were not registered as securities, or that the Par Funding regulatory actions or the criminal history of Joseph LaForte were not disclosed in the PPMs.[3]

Contrary to the SEC's arguments, the facts and equities in this case neither support permanent injunctive relief (Alec and Albert have not sold any securities or acted as brokers since July of 2020) nor the significant monetary Tier 2 civil penalties, the SEC now demands. First, like the investors who have been defrauded by Par Funding, Albert Vagnozzi and his wife had also invested in Par Funding and were equally defrauded by Par Funding. Moreover, after Albert became aware that Par Funding's financial representations were suspect (which was further

[1] Defendants hereby request an evidentiary hearing on this Motion. *See also SEC v. Calmes*, 2011 WL 13174658 (S.D. Fla. 2011).

[2] The Vagnozzis understand that the Court is very familiar with the related litigation, *SEC v. CBSG d/b/a Par Funding,* Case No. 20-CV-81205-RAR (S.D. Fla. 2020), where the SEC had similarly filed a Motion for Final Judgment against other individuals who were involved in the sale of promissory notes involving Par Funding. *See SEC v. CBSG*, 2024 WL 4826059 (S.D. Fla. 2024).

[3] Although Defendants do not dispute that LaForte's criminal history was not disclosed in the Capricorn PPMs, there is a dispute as to the timing of such knowledge. In fact, as to Albert Vagnozzi, the SEC has not alleged that he was aware of the criminal history of LaForte during the pertinent times.

confirmed by a preliminary audit report that was commissioned by Albert's financial firm,[4] he immediately ceased selling Par Funding promissory notes in late February of 2020, clawed back recent funds in the amount of $700,000 that were invested in Par Funding on behalf of the investors in March of 2020, and obtained a security interest giving a priority to the investors if Par Funding defaulted on the subsequent negotiated Exchange Offers in April of 2020. Such conduct does not warrant the severe monetary penalties the SEC seeks.

Further, part of the relief the SEC seeks against Albert Vagnozzi by way of disgorgement falls outside the applicable five (5) year statute of limitations and is therefore barred. In that regard the SEC initiated this litigation on September 29, 2023, and thus any promissory notes that were sold by Albert Vagnozzi ***prior*** to September 29, 2018, should not be included in the SEC's disgorgement request and should further reduce the SEC's prejudgment interest calculations.

In its Amended Complaint, the SEC states that it only seeks disgorgement for gains received within the applicable statute of limitations. [ECF No. 197, p. 25] Considering the time that falls outside the statute of limitations period, this Court should reduce the disgorgement, at a minimum, by $49,351.67 which was income received prior to September 29, 2018. Albert Vagnozzi however requests that this Court further reduce the disgorgement amount by approximately $336,398.00 which reflects the total amount of income received as a direct result of the sale of the promissory notes which claims accrued during the excluded statute of limitations period. The disgorgement request should further be reduced by the legitimate business expenses, which were mostly accounting services expenses for tax preparations that Albert personally paid on behalf of Capricorn and Capricorn Parallel. In that regard, Albert continued to pay for the tax

[4] A copy of the Preliminary Audit Report by Maillie, dated February 19, 2020, is attached as **Ex. 3,"** to the Declaration of Albert Vagnozzi, attached hereto as **Ex. "A."**

filings for both Capricorn and Capricorn Parallel for the years 2021 through the present, and those expenses (totaling approximately $43,923.24) should reduce any disgorgement award.

Likewise, the equities do not warrant drastic monetary civil penalties against Alec, who was a recent college graduate and primarily relied on the advice of his father and his attorney, John Pauciulo ("Attorney Pauciulo") regarding securities laws, registration, and disclosures. Moreover, as a direct result of the instant SEC Complaint, Alec not only lost his job at ABFP, but his earnings capacity has since drastically been affected. Following the filing of the SEC Complaint on September 29, 2023, he again lost his job, has been unemployed for most of the past year and has been unable to obtain new employment in the financial industry. Not only has Alec no financial ability to pay the monetary relief the SEC demands, but his life has also already been drastically altered because of this lawsuit. The SEC's request for significant monetary relief as well as permanent injunctive relief in this case is therefore inequitable.

For all the reasons set forth more fully below, Albert Vagnozzi and Alec Vagnozzi request that this Honorable Court deny the requested relief as set forth in the SEC's Motion and instead order relief that is equitable in this case under these circumstances.

## II. RELEVANT PROCEDURAL HISTORY

On July 24, 2020, the SEC filed a lawsuit (the "SEC Lawsuit") against CBSG d/b/a Par Funding ("Par Funding"), its principals, including Joseph LaForte, and related entities in connection with a serious fraud scheme involving its merchant cash business. Instead of lending the money to businesses in need of immediate cash flow, the principals used it for their own personal purposes. When Covid hit and its scheme was no longer sustainable, it defaulted on the promissory notes causing serious harm to the individuals who had invested in Par Funding.

Although the Par Funding case is still pending, significant funds have since been recovered by the Receiver and returned to the investors.[5]

Almost three (3) years after the filing and prosecution of the claims against Par Funding and other culpable parties (and after Defendants in the initial SEC Lawsuit had either consented to judgment or had lost at trial) the SEC then initiated the instant enforcement action against *inter alia* Albert Vagnozzi and Alec Vagnozzi on September 29, 2023, alleging similar claims based on the same sale of the unregistered securities involving Par Funding notes. By the time the SEC had filed its claims against Defendants, both Alec and Albert had stopped selling any promissory notes involving Par Funding, had ceased operating Capricorn and Pisces and had already provided investigatory testimony to the SEC a year prior regarding their involvement. Moreover, as of July of 2022, John Pauciulo, the attorney who provided legal securities advice to both Albert and Alec had already explained his significant involvement that led to the securities violations and agreed to pay a penalty in the amount of $125,000.

Like the initial SEC Lawsuit filed in July of 2020 by the SEC against Par Funding, the SEC's claims against Albert and Alec included violations of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c)], Section 17(a)(1)(2) and (3) of the Securities Act [15 U.S.C. §77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] and Section 15(a) of the Exchange Act [15 USC § 78q(a)]. [ECF No. 1] Importantly, it included *scienter*-based claims, which quite frankly were not supported based on the record, and which forced Defendants to continue the defense of the SEC litigation.

[5] The SEC has stated that the CBSG Receiver recently indicated that 98.35% of allowed claims of Capricorn investors will be paid in the amount of $14.3 million, and that most investors including those who invested through Pisces may recover up to 100% of their allowable claims. [ECF No. 218, p 20 and p. 24 fn. 12.]

However, in February of 2025, following the filing of Defendants' Joint Motion for Partial Summary Judgment [ECF No.150], Defendants' Motion to Strike Plaintiff's Motion for Summary Judgment [ECF No.166] and the Court's subsequent Order regarding the SEC's inability to follow Court orders, comply with deadlines, or conform to the requirements of the Local Rules [ECF No. 167], the SEC through new counsel [ECF No. 188] finally agreed to dismiss the *scienter*-based claims against Defendants. Shortly thereafter, on March 14, 2025, the parties notified the Court that a settlement agreement was reached, which would obviate the need for a trial [ECF No. 191].

On July 15, 2025, the SEC filed an Amended Complaint ***dropping*** claims under Section 17(a) (1) of the Securities Act, Section 10(b) and Rule 10b-5 of the Exchange Act, against all Defendants. [ECF No. 197] Defendants Albert and Alec Vagnozzi consented to Judgment as to the remaining violations, and on July 21, 2025, Judgment as to Defendant Albert and Alec Vagnozzi was entered. [ECF No. 203]. It was further agreed "that upon motion of the Commission, the Court shall determine whether it is appropriate to order disgorgement of ill-gotten gains and/or civil penalty. . .." [ECF No. 203].

On February 18, 2026, the SEC filed the instant Motion for Final Judgment Against all Defendants. [ECF No. 218]

## III. FACTUAL BACKGROUND

In support of its Motion for Final Judgment [ECF No. 218], the SEC solely relies on the allegations set forth in the Amended Complaint, which incorporated most allegations as initially asserted in the Complaint, a pleading filed without the benefit of substantial discovery or deposition testimony. To be clear Defendants do not contest liability, but the allegations asserted in the Amended Complaint should not be read in a vacuum and, rather the factual background and context as set forth below shows that the relief the SEC seeks is not equitable, is rather excessive,

does not accomplish the policy goals and should therefore be denied as requested under these circumstances.

### A. Pertinent Facts Pertaining to Alec Vagnozzi

Alec graduated from Penn State University in or around May of 2018. [ECF No.73-1, Alec Test., 16:14-19] and [ECF. No. 151 ¶ 9.] After working for a year at JP Morgan in Portfolio Management, Alec, at the age of 23, also became employed in or around May/June of 2019 at ABFP, a business that was owned by his father, Dean Vagnozzi. [Doc. No. 151 ¶ 10.] While employed at ABFP, Alec primarily assisted with handling paperwork, including paperwork regarding transfers of cash or IRA funds, and made sure everything was signed. [Doc. No. 151 ¶ 11.] As part of his training and learning process, Alec would sometimes sit in client meetings as an observer. [Doc. No. 151 ¶ 12.] During the early stages of his employment at ABFP, Alec would have limited contact with the investors. [Doc. No. 151 ¶ 13.] Though Alec heard rumors about LaForte's criminal background, he did not know about any specifics and was unaware of any news coverage concerning Mr. LaForte's criminal background in 2019. [ECF. No. 151 ¶ 38.] Alec was unaware of any specifics regarding the Pennsylvania Regulatory Action, which occurred prior to his employment with ABFP, and he did not learn of the New Jersey or Texas actions until he was deposed in 2022. [ECF No. 151 ¶ 42.]

In September 2019, and based on his father's suggestion, Alec and Shannon Westhead retained Eckert to form Pisces Income Fund LLC ("Pisces"), where each was a 50% owner of the company. [ECF-73-1, Alec Test., 63:7-17] At that time, his father with the assistance of his legal counsel Pauciulo had already sold promissory notes in connection with investments in Par Funding for over two years. Pursuant to the Engagement letter, Eckert advised and agreed that its services will consist of the following: (i) the formation of a Delaware limited liability company, (ii) the

preparation of a private placement memorandum to be used in connection with the offering of ownership interests in the fund, (iii) the preparation and filing of such forms as may be necessary to have the fund comply with applicable state and federal securities laws including Form D and (iv) counseling with respect to conducting the offering." [ECF No. 151 ¶ 56.]

On or about September 16, 2019, Eckert formed Pisces and submitted necessary documentation to the relevant authorities to form Pisces as a Delaware limited liability company. [ECF. No. 151 ¶ 57.] Pauciulo and Eckert also drafted and prepared the Pisces PPM, subscription agreement, and investor questionnaire to be used in connection with the offering of ownership interests in Pisces. [ECF No. 151 ¶ 58.] Shannon and Alec relied on Pauciulo as their attorney to advise them of any necessary changes from previous funds' offering documents that needed to be made for Pisces or disclosures that needed to be made to investors. [Doc. No. 151 ¶ 63.] Pauciulo was aware of the Pennsylvania and New Jersey Regulatory Actions and LaForte's criminal history, but he never advised Shannon or Alec that they needed to be disclosed to investors. [Doc. No. 151 ¶ 64.] Pauciulo did not disclose the New Jersey and Pennsylvania Regulatory Actions and LaForte's criminal history in the PPM. [ECF-No. 151 ¶ 67.] Although Alec was a 50% owner in Pisces, Alec was only identified as the sole Agent in connection with only one Pisces investor and as a co-agent in connection with approximately eight other Pisces investors. [ECF- No. 151 ¶ 69.][6]

In approximately March or April 2020, due to the Covid-19 pandemic and because small businesses were not able to pay CBSG on their loans, CBSG informed Dean and ABFP that it could no longer pay on its notes with ABFP's funds and offered reissued notes with a lower interest [ECF. No. 151 ¶ 70.]

[6] A copy of the Pisces Workbook is attached as **Ex. "1."** to the Declaration of Alec Vagnozzi, which is attached hereto as **Ex. B."** Alec Vagnozzi does not dispute that Pisces raised at least 15.4 million from more than 80 investors. However, the undisputed evidence showed that Alec was not involved with the initial sales of promissory notes to most of the Pisces investors.

In April and May 2020, Pauciulo executed a non-disclosure agreement so he could receive and review CBSG's financials and performed additional due diligence by reviewing these financial documents. [ECF- No. 151 ¶ 71.] Alec personally was minimally involved in the exchange offering process. [ECF. No. 151 ¶ 73.] Although Alec executed documents, he was minimally involved with the formation of Pisces Parallel, which was handled by Pauciulo or his office. [Doc. No. 151 ¶ 79.] On September 20, 2022, Alec Vagnozzi was deposed by the SEC as part of its investigation in connection with the matter of United Fidelis Group, as well as Alec's employment at ABFP. [ECF No. 73-1]

**B. Pertinent Facts Pertaining to Albert Vagnozzi**

Following a twenty-year career in law enforcement, Albert Vagnozzi ("Albert") continued his professional career in 2013 as an investment advisor representative with PTK Financial. [ECF 73-2, Albert Test., 20:20-21:22] and [ECF. No. 151 ¶ 86.] In or around 2016, Albert heard about MCA investments and CBSG through his brother, Dean, and in 2017, Albert learned that Dean's business was growing by investing money in CBSG. [ECF. No. 151 ¶ 87.] Albert understood the CBSG investment to be an investment in small business loans, at a given rate of return, paid monthly to the investor. [ECF No. 151 ¶ 88.]

On January 10, 2018, Albert and his partner, Paul Kohler ("Kohler"), met with Pauciulo to discuss forming a fund in compliance with securities laws, and Pauciulo told them that he had conducted extensive due diligence on CBSG as well as their operations and financials, and he was fully informed on CBSG operations. [ECF No. 151 ¶ 89.] Thereafter, Pauciulo had numerous communications both orally and in writing with Albert and Kohler regarding the formation of a merchant cash fund. [ECF. No. 151 ¶ 90.] Despite being aware of LaForte's criminal history in

2017, Pauciulo did not disclose this information to Albert and Kohler at their meeting on January 10, 2018 or thereafter. [ECF No. 151 ¶ 91.]

On February 20, 2018, Albert and Kohler received a letter from Eckert signed by Pauciulo agreeing to provide legal representation in connection with the "planning and structuring a potential offer of securities by an investment fund . . ." and stating that the "services will consist of the following: (i) the preparation of a private placement memorandum to be used in connection with the offering of ownership interests in the fund, (ii) the preparation and filing of such forms as may be necessary to have the fund comply with applicable state and federal securities laws including Form D and (iii) counseling with respect to conducting the offering and other regulatory compliance." [ECF No. 151 ¶ 92.]

Based on several prior conversations, and because Pauciulo had done similar work for Dean regarding CBSG, including due diligence of CBSG, Albert and Kohler retained Pauciulo to do everything they needed to properly create a private placement for the merchant cash notes. [ECF 73-2] and [ECF No. 151 ¶ 93.]

On March 15, 2018, Eckert incorporated the Capricorn Income Fund, LLC in the State of Delaware with Albert and Kohler being a 50% owner of the company. [ECF. No. 151 ¶ 94.] On May 22, 2018, to ensure compliance with securities laws, Pauciulo, as the attorney in fact, filled out, prepared and filed Capricorn's Reg D. Notice of Exemption Form. [ECF No. 151 ¶ 95.] Importantly, Pauciulo drafted and prepared Capricorn's PPMs and further provided advice and guidance about setting the rates of return. [ECF No. 151 ¶ 96.]

From April 2018 through approximately February of 2020, Capricorn had approximately 80 individual clients who invested in CBSG. [ECF No. 151 ¶ 97.] Relying on Pauciulo, Albert and Kohler appropriately disclosed to Capricorn's investors details about the fund, including

CBSG's operations, business type, and associated risks, using information provided by CBSG, such as a PowerPoint presentation and weekly default rate. [ECF No. 151 ¶ 98.] During his meeting with investors, Albert mainly discussed how CBSG's investments worked and never represented these investment opportunities as secure or safe, ensuring that investors properly understood the associated risks. [ECF. No. 151 ¶ 99.] Many clients who invested and/or renewed in Capricorn were either existing clients, family, friends, or referred. [ECF No. 151 ¶ 100.]

In or around 2019, Albert became aware that CBSG had conducted an audit for the year 2017, that the audit information would be released, and that a second audit was being conducted. [ECF No. 151 ¶ 101.] Because of the delay of the second audit, Albert and Kohler decided to have a separate CPA firm, Maillie, review the initial CBSG audit results, and their preliminary letter advised that there were concerns about multiple entities inside Par Funding. [ECF. No. 151 ¶ 102.] Because CBSG had failed to provide the results of the second audit and based on the preliminary letter from Maillie, the Capricorn Income Fund, LLC was subsequently shut down. [ECF. No. 151 ¶ 103.]

Thereafter, Pauciulo was again involved and provided legal advice in connection with the Exchange Notes. [ECF. No. 151 ¶ 104.]

In or around March of 2020, and with the onset of the Covid 19 pandemic, CBSG announced that it would not be able to make payments and froze the funds. Albert and Kohler spoke with Pauciulo and carefully followed his advice on how to handle this situation on behalf of the investors. [ECF No. 151 ¶ 105.] Pauciulo then spoke with counsel for CBSG and devised a plan, which consisted of preparing "Exchange Offers" between CBSG and investors in Capricorn, by which CBSG would pay, and the investors would accept lesser payments of interest over a longer time. [ECF No. 151 ¶ 106.] Pauciulo advised Albert and Kohler to proceed with the

investors this way as this was the best alternative for the investors to recover their investments in CBSG and that engaging in any litigation with CBSG could lead to CBSG filing for bankruptcy. [ECF. No. 151 ¶ 107.]

To implement the Exchange Offer program, Pauciulo drafted Supplements to the PPMs and created a second fund to reissue the notes to the investors. [ECF No. 151 ¶ 108.]

Despite being aware of LaForte's criminal history as well as Par Funding's regulatory actions, Pauciulo did not disclose this information in the disclosure documents he prepared in connection with the Exchange Offer but instead used the prior disclosures. [ECF No. 151 ¶ 109.] Following conversations with Pauciulo, Albert executed a UCC lien document as a security agent, which he understood would provide some financial protection for the investors against CBSG in the event of default. [ECF No. 151 ¶ 110.]

When Albert and Kohler started Capricorn, they extensively relied on the advice of their attorney, Pauciulo, who prepared all necessary documents, and the information they received from the representatives of Par Funding, including some financials as well as default rates. [ECF. No. 151 ¶ 111.]

Only in or around April 2020, Albert for the first time heard the name Joseph LaForte but did not know of his criminal background until the SEC filed its first complaint related to CBSG. [ECF No. 151 ¶ 112.] Further, Albert was not aware of the New Jersey and Pennsylvania Regulatory Actions against Par Funding at the time of Capricorn's first offering, in particular, because these regulatory actions were initiated only several months after Capricorn had been formed. [ECF No. 151 ¶ 114.] The Pennsylvania and New Jersey Regulatory Actions against Par Funding did not shut Par Funding down, nor did they state that LaForte had a criminal background. [ECF No. 151 ¶ 115.] Although Albert does not remember having had specific discussions with

Pauciulo regarding the Pennsylvania and New Jersey Regulatory Actions against Par Funding after he had first learned about them, he does recall that these issues were discussed. [ECF No. 151 ¶ 116.] Despite being aware of LaForte's criminal record (which Albert was unaware of) and PAR Funding regulatory actions, Pauciulo, as an attorney responsible for the formation of Capricorn, decided not to disclose this in Capricorn's PPMs. [ECF No. 151 ¶ 117.] On September 27, 2022, Albert was deposed by the SEC as part of its investigation in connection with the matter of *United Fidelis Group*, and the Capricorn funds. [ECF No. 73-2]

## IV. <u>LEGAL ARGUMENT</u>

### A. THE COURT HAS DISCRETION TO AWARD DISGORGEMENT, WHICH IS AN <u>EQUITABLE REMEDY AND NOT A PENALTY</u>

An award of disgorgement is an equitable remedy, not a mandatory one, and is subject to the Court's discretion. *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004) (district courts retain discretion to reduce disgorgement where the SEC's approximation is unreasonable); *SEC v. Yun*, 327 F.3d 1263, 1269 fn.10 (11th Cir. 2003) (disgorgement is equitable and must be assessed through the "lens of fairness"). Disgorgement further requires a reasonable approximation between the alleged violation and the defendant's ill-gotten gains. *SEC v. Monterosso*, 756 F.3d 1326, 1337 (11th Cir. 2014). More importantly, the Eleventh Circuit recognizes disgorgement as an equitable remedy, and has made clear that disgorgement may be reduced or denied where equity so requires — including where disgorgement would be punitive, disproportionate, or serve no remedial purpose. *See, e.g., SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 ("Disgorgement may not exceed a defendant's unjust enrichment.")

Furthermore, pursuant to 15 U.S.C.A. section 78u (d) (8) (A), the Commission may bring a claim for disgorgement under paragraph (7) (i) not later than 5 years after the latest date of the

violation that gives rise to the action or proceeding in which the Commission seeks the claim occurs.[7]

**1. <u>Disgorgement Against Alec Vagnozzi is Inequitable</u>**

The SEC seeks disgorgement against Alec Vagnozzi in the amount of $128,500. The SEC's argument is based solely on the bank accounts of Pisces which shows a transfer of approximately $128,500 to Alec Vagnozzi. The SEC has not made a reasonable approximation that the money Alec received was part of any ill-gotten profits versus ABFP's employment compensation. As reflected in the Pisces Workbook, Alec was minimally involved in the sale of promissory notes to investors. The Pisces Workbook shows that he was listed as a sole agent on one occasion only. Moreover, Alec did not decide on the payment in the amount of $128,500, instead, he was instructed by his father and employer ABFP to transfer this amount, which he used to pay off his student loans. For those reasons, and within the discretion of the Court, Alec requests that any disgorgement award be reduced considering the fairness and equities of these facts.

**2. Disgorgement Against Albert Vagnozzi is Partially Barred by the Applicable 5 Year Statute of Limitations and Must Further Be Reduced by Continued Legitimate Business Accounting Expenses Incurred That Were Personally Paid <u>by Albert after Capricorn and Capricorn Parallel Ceased Operating</u>**

The SEC seeks disgorgement against Albert Vagnozzi in the amount of $969,686.29. This amount is based on the SEC's analysis of Capricorns' banking records which simply showed the total amount of money that was transferred to Albert Vagnozzi. The SEC agrees and can only claim disgorgement on any ill-gotten gains that were received within the applicable statute of limitations. [ECF No. 197, p. 25] The SEC instituted this action on September 29, 2023.

[7] Previously, the courts applied a five-year statute of limitations under section 28 U.S.C. § 2462 (which provides that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued) when the SEC sought disgorgement or civil penalties. *See also Kokesh v. SEC*, 581 U.S. 455 (2017) However, following the Court's decision in *Liu v. SEC*, 591 U.S. 71 (2020), Congress explicitly added "disgorgement" to the SEC's list of enforcement tools and further provided applicable statute of limitations provisions. *See also Sripetch v. SEC*, 608 U.S. ___ (2026).

Consequently, any money received as a direct result of the non-registration violations ***prior*** to September 29, 2018, should be precluded. The amount received prior to September 29, 2018 is $49,351.67.[8] Moreover, since the registration violations accrued on May 22, 2018, when John Pauciulo improperly filed the Form D Registration with the SEC, it is Defendant's position that the income received as a direct result of the sale of the promissory notes which occurred prior to September 29, 2018 (and which also occurred prior to the Orders regarding Par Funding's Regulatory conduct) should therefore be precluded as well. In that regard, Albert Vagnozzi requests that this Court reduce the disgorgement amount by $336,398.00 which reflects the total amount of income received as a direct result of the sale of the promissory notes which claims accrued during the excluded statute of limitations period.

Additionally, the disgorgement amount should also be further reduced by the legitimate business expenses in the amount of $43,923.24.[9] In that regard, Albert paid personally for submission of accounting and tax preparation services for the years 2021 through 2025.[10]

Importantly, where, as here, the Defendant investigated, mitigated, returned funds, ceased operations, and affirmatively benefited investors, equity must be considered in ordering the requested disgorgement.

**B. THIS COURT HAS DISCRETION TO AWARD AND REDUCE PRE-JUDGMENT INTEREST UNDER CIRCUMSTANCES WHERE THEY ARE PUNITIVE AND INEQUITABLE**

Whether to award prejudgment interest and, if so, at what rate, constitute matters falling within the Court's discretion. *See SEC v. Carrillo*, 325 F.3d 1268, 1273 (11th Cir.2003) (citing *Indus. Risk Insurers v. M.A.N. Gutehoffnungshtte GmbH*, 141 F.3d 1434, 1447 (11th Cir.1998).

[8] *See* Declaration of Albert Vagnozzi, ¶6, attached hereto as **Ex. "A."**
[9] *See* Declaration of Albert Vagnozzi, ¶21, **Ex. "A."**
[10] *Id*. at ¶22.

"We have noted that awards of prejudgment interest are compensatory, not punitive, and that the district court should make its interest decision through "an assessment of the equities." *See Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521, 1536 (11th Cir.1987).

An award of prejudgment interest is based on consideration of a variety of factors, including "the remedial purpose of the statute [involved], the goal of depriving culpable defendants of their unlawful gains, and ... unfairness to defendants." *SEC v. First Jersey Securities*, 101 F.3d 1450, 1477 (2d Cir.1996). On appeal, a denial of prejudgment interest will only be reversed if it "was either so unfair or so inequitable as to require us to upset it." *Blau v. Lehman*, 368 U.S. 403, 414 (1962).

In exercising that discretion, courts focus on whether prejudgment interest is necessary to offset any actual benefit from the defendant's use of the funds, and whether an award would be equitable under the circumstances (including delay, restraint of assets, and whether interest would operate punitively rather than compensatory). *Osterneck*, 825 F.2d at 1536.

Courts impose prejudgment interest to prevent those found liable under the securities laws from enjoying any benefit accrued from the use of the ill-gotten gain. *SEC v. Yun*, 148 F.Supp.2d 1287, 1293 (M.D.Fla.2001) (citing *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir.1998)). Although "[w]hether to award prejudgment interest is a question of fairness," *SEC v. GMC Holding Corp.,* 2009 WL 506872, *6 (M.D. Fla. Feb. 27, 2009) (citing *Osterneck*, 825 F.2d 1521, 1536 (11th Cir.1987)), proof of a defendant's scienter justifies such an award. *SEC v. K.W. Brown & Co.*, 555 F.Supp.2d 1275, 1313 (S.D.Fla.2007) (citing *Rolf v. Blyth*, 637 F.2d 77, 87 (2d Cir.1980)).

**1. <u>It Is Inequitable to Have Alec Vagnozzi Pay Pre-Judgment Interest</u>**

The SEC has calculated pre-judgment interest on disgorgement in the amount of

$15,002.82 calculated from October 1, 2023 through February 28, 2025. [ECF no. 218, p. 18] This Court has, however, discretion to reduce and award pre-judgment interest. Considering the equities in this case, including the lack of scienter, Alec's inability to pay, as well as the fact that Alec consented to judgment shortly after the SEC agreed to drop the *scienter*-based claims, any award of pre-judgment interest should be reflective of those factors. In that regard, the SEC's position to continue pursuing the *scienter*-based claims (until Defendants filed a partial summary judgment motion) further contributed to the continued defense of this matter, thus increasing the time period for any pre-judgment interest award. For those reasons, Alec requests that this Court reduce any pre-judgment interest award.

**2. Albert Vagnozzi Pre-Judgment Interest Should be Re-Calculated based on The Reduced Disgorgement Amount**

The SEC has calculated pre-judgment interest on disgorgement in the amount of $113,214.24 incurred from October 2023 through February of 2025. [ECF no. 218, p. 18]. However, considering that the disgorgement award should be reduced by $336,398.00 for payments that should be considered to be barred by the applicable statute of limitations period, as well as reduced by $43,923.24 for subsequent legitimate business expenses for the filing of tax returns for the years 2021 through 2025, a new pre-judgment calculation should be ordered.[11]

**C. THIS COURT SHOULD NOT AWARD OR REDUCE THE CIVIL PENALTIES AGAINST DEFENDANTS**

Civil money penalties are authorized by Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)(1) ] and Section 21(d)(3) of the Exchange Act [15 U.S.C. 78u(d)(3)(A) ]. The purpose of civil money penalties is to serve as a deterrent and punishment against future misconduct. *See*

[11] This Court should further take into consideration that the SEC's position to continue pursuing the scienter-based claims (until Defendants filed a partial summary judgment motion) further contributed to the continued defense of this matter, thus increasing the period for any pre-judgment interest award.

*S.E.C v. Huff,* 758 F. Supp. 2d 1288, 1364 (S.D. Fla. 2010). Section 21(d)(3) of the Exchange Act authorizes three (3) tiers of monetary penalties for statutory violations. 15 U.S.C. § 78u(d)(3). "The first-tier penalty may be imposed for any violation." *S.E.C. v. Monterosso*, 756 F.3d 1326, 1338 (11th Cir. 2014). The "second-tier penalty may be imposed if the violation 'involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.' " *Id.* (quoting 15 U.S.C. 78u(d)(3)(B)(ii)). The "third-tier penalty may be imposed when the second-tier requirements are met and the 'violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.' " *Id.* (quoting 15 U.S.C. 78u(d)(3)(B)(iii)).

The maximum penalty amount for each tier is set forth in 15 U.S.C. § 78u(d)(3). Without an inflation adjustment, the maximum penalties are $5,000 for tier one; $50,000 for tier two; and $100,000 for tier three. 15 U.S.C. 78u(d)(3)(B).

In determining whether to impose civil penalties and the amount of the fine, courts look to a number of factors, including: (i) the egregiousness of the conduct; (ii) the degree of the defendants' scienter; (iii) whether the defendants' conduct created substantial losses or the risk of substantial losses to other persons; (iv) whether the defendants' conduct was isolated or recurrent; and (v) whether the penalty should be reduced due to the defendants' current and future financial condition. *See S.E.C v. Huff,* 758 F. Supp. 2d 1288, 1364 (S.D. Fla. 2010) (citations omitted)*;* While these factors are helpful in characterizing a particular defendant's actions, the civil penalty framework is of a discretionary nature and each case has its own particular facts and circumstances which determine the appropriate penalty to be imposed. Although the statutes (15 U.S.C. §§ 77t(d)(2) (A), 78u(d)(3)(B)(I).) provide guidelines for imposing a civil money penalty, the court has still the discretion to determine the appropriate amount of such penalty.

Courts have also considered the devastating effects of the litigation on the defendant to determine whether civil penalties are warranted. In that regard, the court in *SEC* v. *Snyder*, 2006 WL 6508273, at *12 stated as follows:

> The SEC's arguments [for a civil penalty] trivialize the devastating effects that Defendant has suffered on account of this litigation .... the Court finds that Defendant's prospects of ever again working for a public company are nonexistent, and his chances for employment in accounting at a level even remotely commensurate with his education and experience are very close to nonexistent. Having been precluded from working for certain [ ] clients as a result of the jury's verdict against him, Defendant is no longer able to earn a high income, or perhaps even a modest one. Defendant has amply demonstrated the financial hardship and extreme emotional toll that he has suffered, the effects of which he will likely experience for years into the future. This hardship and Defendant's current financial situation indicate that imposing civil penalties would be inappropriate.

Importantly, Florida federal courts have reduced civil penalties in cases where imposing a severe penalty would not serve an important deterrent function. *See e.g.* *SEC v. Calmes*, 2011 WL 13174658 (S.D. Fla. 2011) (finding that while Defendants actions enabled this severely detrimental scheme, a hefty penalty is not necessary to achieve adequate deterrence, and the Court will impose first-tier $5,000 fines upon each Defendant).

**1. The SEC's Civil Penalty Should be Reduced[12] Because Albert Vagnozzi's Efforts to Protect Investors, His Reliance on Counsel, and PAR's Concealment Weigh Against Severe Penalties and Do Not Serve As a Deterrent**

The SEC seeks civil penalties against Albert, requesting the maximum second-tier statutory penalty in the amount of $118,225 for each of the Securities Act Section 17(a)(2) and (3) violation for a total amount of $236,450. [ECF No. 218, p. 26] Contrary to the SEC's arbitrary Tier 2 calculations, an analysis of the *Huff* factors shows that such a drastic Tier 2 civil penalty is

[12] If the Court is inclined to award any civil penalties, a Tier 1 penalty for each of the Section 17(a)(2) and (3) violations for a total of $10,000 seems most equitable.

inconsistent with the facts in this case.[13] Although the damage to the investors was undoubtedly serious, and is not disputed, considering Albert's reliance on legal counsel (who has admitted to his involvement that led to the non-registration violations) and Par Funding's admitted concealment, Albert's conduct was certainly not egregious. Moreover, the SEC did not allege that Albert knew of LaForte's criminal history and failed to disclose it.[14] Certainly, Albert's reliance on the representations made by the principals of Par Funding regarding its financial status as well as his reliance on legal counsel John Pauciulo who was retained and paid to ensure that the fund was properly registered and complied with securities' laws should be considered as mitigating factors. Indeed, had Pauciulo properly registered the securities *ab initio*, and had provided proper legal advice, no further violations would have occurred.[15] Next, the fact that Albert had invested personal funds in Par Funding as early as October 2018 and had recommended to family members to invest in Par Funding (putting both his reputation and trust at risk) are further supportive that Albert was also misled. Additionally, once Albert became aware of Par Funding's dishonest conduct, no further investments were made into Par Funding. Instead, Albert ensured that recently invested money was promptly returned to the investors. Albert also ensured that in connection with the Exchange Notes, the investors were further protected by obtaining priority security interest. Subsequent litigation initiated by Albert also contributed to additional funds for the benefit of the investors. Clearly, Albert's conduct falls short of any alleged egregiousness.

---

[13] This Court previously awarded a single Tier 3 civil penalty in the amount of $190,000 against another agent, Michael Furman in connection with Par Funding. *See SEC v. CBSG*, 2024 WL 4826059, at *24(S.D. Fla. 2024). Unlike Furman, Albert is far less culpable. The *scienter*-based claims were dropped, Albert consented to the remaining violations and cooperated with the authorities. Therefore, any civil penalties should be far less than $190,000.

[14] *See* SEC's Response to Interrogatory No. 7, -- which requested the SEC to identify the content of each alleged misstatement or omission made by Albert Vagnozzi to each Capricorn investor or potential investor regarding LaForte's criminal history, -- stating "[t]he Complaint does not include this allegation against You and therefore this Interrogatory seeks information that is not relevant to the claims or defenses at issue in this case."

[15] Yet, Attorney Pauciulo who recommended and created the PPMs and was involved in more than twenty other funds with other agents, merely received a fine in the amount of $125,000. *See* Cease and Desist Order, dated July 7, 2022, attached hereto as **Ex. "C". ***See also* [ECF No. 98-1, Ex. "A."]

Importantly, the SEC dropped the *scienter*-based violations which further counsel against the significant civil penalty demanded. That Albert consented to the judgment once the *scienter*-based claims were dropped shows recognition of responsibility and accountability. While it is true that Albert received commissions, those commissions were only paid once the investors were paid first, and at no time did Albert receive funds from the investors' principal investments, or the investors' monthly allocated interest payments. In that regard, it should be noted that Albert's compensation was based on a fixed contractual percentage paid by PAR Funding, and that Albert did not receive money from the investor principal investment, which was retained by Par Funding. The income Capricorn received came from the interest payments received from Par Funding and were only paid when investors received their interest payments. Albert's compensation was thus not enhanced by any non-registration violations. The above conduct, which tellingly, is completely ignored by the SEC, supports that at most a Tier 1 penalty should be considered.

Lastly, the SEC argues, that Albert, a "decorated" police officer, was not honest with the SEC when he provided internal documents to the Receiver reporting that $18 million was raised. [ECF No. 218, p. 25]. The SEC's argument is stretching the truth. Although Capricorn raised more than $18 million dollars in investors' funds during the relevant time, it is also accurate that approximately $18 million of investor funds remained outstanding at the time the SEC filed the lawsuit against Par Funding in July of 2020. There is no evidence that Albert was dishonest and any perceived inaccuracy is at most a misunderstanding or inadvertent mistake. Indeed, Capricorn's pertinent banking records which were provided to the SEC by Albert would easily confirm the total amount of money invested in the Capricorn and Capricorn Parallel funds by the investors. As such, any incorrect statements are not evidence of any dishonesty the SEC wants this Court to believe. Even more, Albert cooperated with the SEC, when he provided documents which

assisted the Receiver. Albert also cooperated when he agreed to an investigatory deposition on September 27, 2022, which took place a year prior to the filing of the instant SEC complaint.

For the foregoing reasons, Albert requests that no civil penalty will be awarded, or in the alternative this Court considers a Tier I penalty for the two (2) violations.

**2. Civil Penalty Should Not Be Awarded Against Alec Vagnozzi Because of His Reliance on Counsel, His Reliance on Par Funding, His Minimal Involvement and Because Of His Financial Situation**

The SEC seeks civil penalties against Alec, requesting total second-tier penalties in the amount of $75,000. The SEC argues that this Tier 2 penalty is consistent with the penalty entered against Pisces Co-manager, Defendant Westhead [ECF No. 218, p. 22] The SEC fails to mention that unlike Defendant Westhead, Alec lost his employment following the instant SEC action and that since the filing of the instant action had extreme difficulty in obtaining subsequent gainful employment. Further, and unlike Defendant Westhead, Alec did not have the same role or responsibilities as Westhead, had far less experience than Westhead, and was not as involved in the sales offering of Par Funding investments. Other than being designated as an owner of the Pisces funds, there are little similarities between Defendant Westhead and Alec, which would warrant the same civil Tier 2 penalty. Applying the *Huff* factors, civil penalties should not be awarded or be reduced. First, the SEC recognizes that Alec did not act in an intentional or reckless manner. Moreover, the SEC dropped all *scienter*-based claims against Alec following the filing of a partial summary judgment motion. [ECF No. 150] Although Alec was part owner of the Pisces funds, he was only involved as an agent in the sale or offering of promissory notes to less than ten (10) investors. His other involvement primarily involved paperwork. Alec (age 23) also relied on the advice of counsel regarding the disclosure as well as compliance with securities laws. Moreover, Alec was unaware of Par Funding's fraudulent conduct. Alec also cooperated with the

authorities and was deposed by the SEC prior to the filing of this lawsuit. Lastly, Alec's financial condition has been dire.[16] He first lost his job at ABFP when the SEC filed the lawsuit against Par Funding and his father in July of 2020. Although he was able to obtain new employment, his employment was terminated shortly after the SEC filed the instant lawsuit. Since then, he has struggled to find employment within the finance industry. He has worked as a fry cook to make ends meet, and after going through an exhaustive interview process, once again did not get the job. He has depleted his savings and the balance on his checking account is minimal. Alec Vagnozzi's taxable income in 2025 was $31,544.[17] In short, Alec's current as well as future financial picture alone does not warrant the imposition of the significant amount of civil penalty requested.

Lastly, Alec has also cooperated with the SEC. In that regard, Alec's investigatory testimony took place on September 20, 2022, a year prior to the instant lawsuit.

Based on his current as well as future financial situations, his relative culpability, the amount of the disgorgement, and the equitable nature of these proceedings, the civil penalties should not be awarded or significantly reduced.[18]

### D. THIS COURT HAS THE DISCRETION TO MODIFY OR REVOKE THE CONSENT JUDGMENTS REGARDING PERMANENT INJUNCTIVE RELIEF WHERE THERE IS NO IRREPARABLE HARM OR RECURRENT VIOLATIONS

Lastly, the SEC seeks permanent injunctive relief. An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course. *Romero–Barcelo,* 456 U.S. 305, 313, (1982) ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law") Moreover, to obtain an injunction, the SEC must

[16] *See* Declaration of Alec Vagnozzi, ¶¶13-33, attached hereto as **Ex. "B."**

[17] Further, not only has Alec's financial situation been impacted, his relationship with his father has also suffered as a direct result of the SEC litigation. The emotional impact has been significant.

[18] In the event this Court believes a civil penalty is warranted, Alec suggests that a single Tier 1 violation of no more than $5,000 would be equitable under these circumstances.

prove by a preponderance of the evidence that (1) Defendant(s) violated the securities laws and (2) that there is a reasonable likelihood that Defendant(s) will repeat the violations. *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir.2004).

In determining whether there is a reasonable likelihood that Defendants will repeat a violation of the securities laws, the Court should consider the following factors: (1) the egregiousness of the defendant(s)' actions, (2) the isolated or recurrent nature of the violations, (3) the degree of scienter involved, (4) the Defendants' recognition of the wrongful nature of their conduct, (5) the sincerity of the Defendants' assurances against future violations, and (6) the likelihood that the defendant(s)' occupation will present opportunities for future violations. *Calvo*, 378 F.3d at 1216. Importantly, the Eleventh Circuit has held repeatedly that "obey the law" injunctions are unenforceable. *See, SEC v. Smyth,* 420 F.3d 1225 (11th Cir. 2005)(citing *Burton v. City of Belle Glade*, 178 F.3d 1175, 1200 (11th Cir.1999) (which held that injunction which prohibited municipality from discriminating on the basis of race in its annexation decisions "would do no more than instruct the City to 'obey the law,' " and therefore was invalid).

Although Defendants have consented to the injunctive relief as demanded by the SEC, this Court still has discretion to modify or revoke injunctive relief based on the equities. In that regard, both Alec and Albert have not acted as a broker dealer or sold securities in the past five (5) years, and no irreparable harm will occur in the absence of an injunction. In fact, even prior to the filing of the SEC Complaint, Defendants had not violated any securities for almost three (3) years (July of 2020), and no violations have occurred over the past six (6) years. Furthermore, both Alec and Albert are currently not employed in the financial industry. Entering permanent injunctive relief as a final judgment would therefore be inequitable, and more akin to an "obey the law" injunction.

## V. CONCLUSION

For all the foregoing reasons, Albert and Alec Vagnozzi respectfully request this Honorable Court to modify the SEC's Motion for Final Judgment consistent with the equities in this case and request an evidentiary hearing.

**BOCHETTO & LENTZ, P.C.**
George Bochetto, Esquire
1524 Locust Street
Philadelphia, PA 19102
Telephone: 215-735-3900
*Pro Hac Vice*
Email: gbochetto@bochettoandlentz.com

*/s/ Matthew L. Minsky*
By: ___________________________
**MINSKY LAW, LLC**
123 S. Broad Street, 15th Floor
Philadelphia, PA 19109
Telephone: 215-215-4567
Email: mminsky@theminskyfirm.com
*Attorneys for Defendants Albert Vagnozzi and Alec Vagnozzi*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing document was electronically filed August 10, 2026, with the CM/ECF filing portal, which will send a notice of electronic filing to all counsel of record.

Respectfully submitted, this 10th day of August 2026.

**BOCHETTO & LENTZ, P.C.**
George Bochetto, Esquire
1524 Locust Street
Philadelphia, PA 19102
Telephone: 215-735-3900
*Pro Hac Vice*
Email: gbochetto@bochettoandlentz.com

*/s/ Matthew L. Minsky*
By: ______________________________
**MINSKY LAW, LLC**
123 S. Broad Street, 15th Floor
Philadelphia, PA 19109
Telephone: 215-215-4567
Email: mminsky@theminskyfirm.com
*Attorneys for Defendants Albert Vagnozzi and Alec Vagnozzi*